**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
Dallas Division**

|  |  |  |
|---|---|---|
| BEST CARE HOSPICE, LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: _____ |
| | ) | |
| ROBERT F. KENNEDY, JR., SECRETARY | ) | |
| OF THE UNITED STATES DEPARTMENT | ) | |
| OF HEALTH AND HUMAN SERVICES | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT FOR INJUNCTIVE RELIEF AND JUDICIAL REVIEW**

Plaintiff, Best Care Hospice, LLC ("Best Care"), by and through its undersigned legal counsel, hereby files this Complaint for Injunctive Relief and Judicial Review against Defendant, Robert F. Kennedy, Jr., in his official capacity as the Secretary of the U.S. Department of Health and Human Services ("Secretary"), following the entry of an administrative order by the Medicare Appeals Council ("Council") as to Council docket number M-24-3100 and Office of Medicare Hearings and Appeals (OMHA) appeal number 3-13118211835, and in support thereof states as follows:

**STATEMENT OF THE CASE**

1.      Best Care is a locally owned and operated provider of hospice services. Best Care brings this action to challenge the Secretary's flawed decision that it has received millions of dollars in Medicare overpayments for hospice services provided to frail, medically complex, and terminally ill beneficiaries.

2.      Even though Congress has deliberately placed the hospice physician's clinical

judgment at the center of the hospice patient eligibility determination process, the Secretary has inappropriately substituted his lay opinion for that of the treating hospice physicians and Dr. Alexander Peralta, an independent, board-certified hospice physician.

3. In reaching his decision that Medicare has overpaid Best Care for the hospice claims at issue in this case, the Secretary has improperly construed and misapplied recommended sub-regulatory guidelines concerning hospice patient eligibility.

4. In his review of the case to date, the Secretary has impermissibly applied legal criteria that are not found in any law, rule, or regulation and factors that the Centers for Medicare and Medicaid Services (CMS) has expressly refused to adopt in its guidance to the hospice provider community.

5. The Secretary's final decision fails to appropriately account for relevant clinical evidence in an administrative record consisting of tens of thousands of pages of medical evidence and instead relies on a narrow set of cherry-picked facts.

6. The Secretary's flawed and unsupported audit determination has placed extraordinary financial strain on Best Care's operations. The Secretary has required that Best Care enter into an extended repayment schedule (ERS) to make repayments in monthly installments while it challenges the overpayment findings. If Best Care failed to make a required payment under the ERS, the Secretary would recoup all of Best Care's Medicare reimbursement to offset the alleged overpayment.

7. Best Care now seeks an order from this Court directing the Secretary to collect no more than $54,000 per month under the existing ERS for the duration of this litigation and declaring the Secretary's final decision to be (1) unlawful; (2) unsupported by substantial evidence; and (3) arbitrary and capricious. Best Care also requests an award of any and all

damages, penalties, costs, and attorneys' fees to the maximum extent allowable under law.

## PARTIES

8.      Best Care is a limited liability company organized under the laws of the State of Texas and a locally owned and operated Medicare-certified provider of hospice services. Best Care's principal place of business is located at 17330 Preston Road, Suite 150A-4, Dallas, Texas 75252.

9.      Robert F. Kennedy, Jr. is the Secretary of the U.S. Department of Health and Human Services (HHS) and the proper Defendant in this action pursuant to 42 C.F.R. § 405.1136(d)(1).

## JURISDICTION AND VENUE

10.     The Court has jurisdiction over this action pursuant to 42 U.S.C. § 1395ff(b)(1)(A) (incorporating by reference 42 U.S.C. § 405(g)), which authorizes judicial review of the Secretary's final decision as to a Medicare reimbursement dispute such as this.

11.     Venue is proper pursuant to 42 U.S.C. § 1395ff(b)(1)(A) because Best Care's principal place of business is located in this judicial district.

12.     The amount in controversy exceeds the jurisdictional requirement set forth at 42 U.S.C. § 1395ff(b)(1)(E)(i).

13.     This action has been initiated within 60 days of the Council's administrative order dated March 26, 2026, as required by 42 C.F.R. § 405.1132(b).

## MEDICARE COVERAGE OF HOSPICE SERVICES

14.     Medicare is the federal health insurance program for the elderly and disabled established in 1965. The Medicare statute is codified at 42 U.S.C. § 1395 *et seq.*

15.     The Medicare program is administered by CMS, which is an agency within HHS.

16.    CMS engages with numerous private contractors to assist in the administration of the Medicare program. The types of contractors relevant to this matter include Medicare Administrative Contractors (MACs), Unified Program Integrity Contractors (UPICs), and Qualified Independent Contractors (QICs).

17.    MACs perform numerous functions on behalf of CMS, including but not limited to claims processing, beneficiary and provider enrollment, adjudication of administrative claim appeals, development of Medicare policies, and provider outreach and education. *See* 42 U.S.C. § 1395kk-1(a)(4).

18.    UPICs assist CMS with program integrity efforts, such as auditing claims to ensure those claims meet all Medicare requirements for coverage and payment. These claim audits can occur on a pre-payment or post-payment basis. *See* 42 U.S.C. § 1395ddd(b)-(c).

19.    QICs conduct administrative claim appeals on behalf of CMS. *See* 42 U.S.C. § 1395ff(c).

20.    Each CMS contractor is responsible for overseeing or assisting with Medicare program operations in a dedicated geographic area of the country. For example, the MAC with "jurisdiction" over hospice providers in Texas, like Best Care, is Palmetto GBA ("Palmetto").

21.    CMS explains the purpose and goals of hospice care as follows:

> Hospice care is an approach to caring for the terminally ill individual that provides palliative care rather than traditional medical care and curative treatment. Palliative care is an approach that improves the quality of life of patients and their families facing the problems associated with life-threatening illness through the prevention and relief of suffering by means of early identification, assessment and treatment of pain and other issues. Hospice care allows the patient to remain at home as long as possible by providing support to the patient and family, and by keeping the patient as comfortable as possible while maintaining his or her dignity and quality of life.

Medicare and Medicaid Programs; Hospice Conditions of Participation,73 Fed. Reg. 32088,

32088 (June 5, 2008).

22.     Medicare defines the term "hospice services" to include all services, medications, and equipment necessary for the palliation and management of a terminal condition. Hospice services may include, but are not limited to, physician services, nursing care, medical social services, spiritual counseling services, short-term inpatient care, and physical, occupational, and speech therapy. *See* 42 U.S.C. § 1395x(dd)(1); *see also* 42 C.F.R. § 418.3.

23.     An individual is considered "terminally ill" when he or she has a life expectancy of six months or less if the illness runs its normal course. 42 U.S.C. § 1395x(dd)(3)(A).

24.     Medicare covers reasonable and necessary hospice services furnished to eligible beneficiaries. To qualify for the Medicare hospice benefit, a beneficiary must elect to receive hospice care and be certified as terminally ill by a physician. 42 C.F.R. § 418.20.

25.     To elect hospice services, an individual must sign an election statement that includes, but is not limited to, the name of the designated hospice, a statement that the individual has been given a full understanding of the palliative (rather than curative) nature of hospice care, the effective date when the individual wishes to begin receiving hospice services, the identity of the beneficiary's attending physician (if the beneficiary has one), and information on cost-sharing.[1] 42 U.S.C. § 1395d(d)(1); 42 C.F.R. § 418.24.

26.     By electing to receive services under the Medicare hospice benefit, a beneficiary waives all rights to have Medicare payment made for any other items or services furnished in connection with the beneficiary's terminal illness and related conditions. 42 U.S.C. § 1395d(d)(2)(A).

---

[1] The "attending physician" is the physician, nurse practitioner, or physician assistant whom the beneficiary identifies as having the most significant role in the determination and delivery of medical care to the individual at the time the individual makes an election to receive hospice care. 42 U.S.C. § 1395x(dd)(3)(B).

27.    Once a beneficiary elects to receive hospice services, the hospice medical director (and the beneficiary's attending physician, when so designated) must certify that the beneficiary is terminally ill. The certification is based on the medical director's or physician's clinical judgment regarding the normal course of the patient's illness. 42 U.S.C. § 1395f(a)(7)(A). Certifications must also conform to various content and timeliness requirements established by CMS. 42 C.F.R. § 418.22.

28.    Each hospice certification covers a designated benefit period. Beneficiaries are entitled to receive hospice services through two consecutive 90-day benefit periods followed by an unlimited number of 60-day benefit periods. 42 U.S.C. § 1395f(a)(7)(A). The hospice medical director and beneficiary's attending physician, if one has been designated, must execute a certification at the beginning of each certification period.[2] *Id.*

29.    The Medicare statute and CMS regulations expressly recognize the pivotal role played by the hospice physician's clinical judgment with respect to hospice patient eligibility determinations. 42 U.S.C. § 1395f(a)(7)(A)(i); 42 C.F.R. § 418.22(b). In recognition of the centrality of the hospice physician's discretion and clinical judgment in the patient eligibility determination process, CMS has previously considered and expressly declined to create specific criteria that would govern or constrain that clinical judgment. *See* Medicare and Medicaid Programs: Hospice Conditions of Participation, 73 Fed. Reg. 32088, 32138 (June 5, 2008).

30.    Beginning with the third benefit period and continuing for each benefit period thereafter, a hospice physician or hospice nurse practitioner must conduct a face-to-face encounter with the beneficiary to perform an assessment and gather clinical evidence relevant to

---

[2] The medical director and the beneficiary's attending physician must both execute the certification covering the first benefit period. The Medicare statute and CMS regulations only require the hospice medical director to execute each certification thereafter, although the beneficiary's attending physician may also participate in the subsequent certification processes. 42 U.S.C. § 1395f(a)(7)(A)(ii).

the beneficiary's terminal condition. The findings from the face-to-face encounter are then provided to the hospice medical director for purposes of determining the beneficiary's continued eligibility for hospice services and making the required certification. 42 U.S.C. § 1395f(a)(7)(D); 42 C.F.R. § 418.22(a)(4).

31.    Hospice services are provided through the coordination and management of an interdisciplinary group ("IDG") of clinical professionals, including, at a minimum, the hospice physician, a registered nurse, a social worker, and a spiritual counselor. [3] 42 U.S.C. § 1395x(dd)(2)(B); 42 C.F.R. § 418.56(a)(1). The IDG is responsible for developing, implementing, and revising the patient's plan of care. 42 U.S.C. § 1395f(a)(7)(B)-(C); 42 C.F.R. § 418.56(b).

32.    The IDG is required to meet as frequently as the patient's condition requires (but in no case less frequently than every 15 days) to review and, if necessary, revise the plan of care. 42 C.F.R. § 418.56(b).

33.    The only beneficiary eligibility requirement for hospice services set forth in the Medicare statute and CMS regulations is that the beneficiary be terminally ill with a life expectancy of six months or less if the illness runs its normal course. *See* 42 U.S.C. § 1395x(dd)(1); 42 C.F.R. § 418.20.

34.    CMS does not require that beneficiaries exhibit rapid decline in their conditions, unstable medical problems, or uncontrolled symptoms to be eligible for the Medicare hospice benefit. CMS also does not require that frequent changes be made to a beneficiary's plan of care in order to substantiate the need for hospice services.

35.    Both Congress and CMS have recognized the inherent difficulty in

---

[3] The IDG may also include any other clinical professionals, such as a physical therapist or dietitian, necessary to carry out the patient's plan of treatment. *See* 42 C.F.R. § 418.56(a)(1).

prognosticating life expectancy. Medicare Program; Hospice Care Amendments, 67 Fed. Reg. 70363, 70364 (Nov. 22, 2002); Medicare Benefit Policy Manual (MBPM) Ch. 9 (CMS IOM Pub. 100-02, Rev. 246) (2018) ("Predicting life expectancy is not always exact.").

36.    CMS has developed various subregulatory guidance documents, such as the MBPM, that elaborate on and clarify coverage and payment rules set forth in Medicare regulations.

37.    MACs also create Medicare coverage policies on behalf of CMS. These documents are called Local Coverage Determinations ("LCDs"). LCDs are guidance documents respecting whether a particular service or item is considered medically reasonable and necessary throughout the MAC's jurisdiction.[4] 42 U.S.C. § 1395ff(f)(2)(B).

38.    Palmetto has promulgated several LCDs that are relevant to the hospice services furnished to beneficiaries with specific terminal illnesses, including L34547 ("Hospice – Neurological Conditions"), L34548 ("Hospice – Cardiopulmonary Conditions"), and L34567 ("Hospice – Alzheimer's Disease and Related Disorders"). These LCDs set forth recommended guidelines for hospice providers to utilize in determining and documenting whether a beneficiary is terminally ill.

39.    The LCDs relevant to this case contain recommended guidelines for establishing medical necessity of hospice services, as evidenced by the MAC's use permissive language, such as "should" and "may," as opposed to mandatory language (words such as "shall" and "must"), throughout each policy.

40.    For example, L34567 states in relevant part: "Alzheimer's Disease (AD) and related disorders may support a prognosis of six months or less under many clinical scenarios.

---

[4] Some provisions of the Medicare statute use the outdated terms "fiscal intermediary" and "carrier," which were the predecessor entities to MACs.

The identification of specific structural/functional impairments, together with any relevant activity limitations, *should* serve as the basis for palliative interventions and care planning." (emphasis added). The LCD goes on to provide that, "Ultimately, the combined effects of the AD…and any comorbid [or secondary] condition *should* be such that *most* beneficiaries with AD…and similar impairments would have a prognosis of 6 months or less." (emphasis added). The LCD then concludes: "For beneficiaries with AD to be eligible for hospice, the individual *should* have [advanced Alzheimer's Disease] and specific comorbid or secondary conditions meeting the above criteria." (emphasis added). L34547 and L34548 contain similarly permissive language.

41.    The LCDs are one path to documenting and establishing beneficiary eligibility for hospice services. As each LCD acknowledges, a beneficiary can be eligible for hospice services due to Alzheimer's Disease or a related disorder, a neurological condition, or a cardiopulmonary condition "under many clinical scenarios."

42.    A beneficiary is discharged from hospice when he or she passes away, revokes the election to receive hospice care (if, for example, he or she wishes to pursue curative treatment for the terminal illness), wishes to transfer to a different hospice provider, or moves outside of the hospice's designated service area. 42 C.F.R. § 418.26.

43.    Although hospice physicians must execute certifications covering benefit periods that are 90 days and 60 days in length, CMS requires that claims for hospice services be billed in monthly increments. Medicare Claims Processing Manual Ch. 11 § 90 (CMS IOM Pub. 100-04, Rev. 3502) (2016).[5]

---

[5] For example, if Ms. Smith elected hospice care on April 20 and lived through at least the month of May, the hospice's first Medicare claim would cover dates of service from April 20 to April 30. The hospice's second (separate) claim would then include dates of service May 1 through May 31.

## MEDICARE CLAIM AUDITS, APPEALS, AND OVERPAYMENT RECOVERY PROCEDURES

44.    In the event a CMS contractor, such as a UPIC, denies a Medicare claim on a post-payment basis, then the provider is responsible for repaying any overpayment associated with the denied claim.

45.    Providers who are dissatisfied with an adverse claim determination may contest that decision through a four-step administrative appeals process. *See* 42 U.S.C. § 1395ff(b).

46.    The four steps in CMS' administrative claim appeal process are redetermination, reconsideration, a hearing before an ALJ, and review by the Council.

47.    Requests for redetermination are processed by MACs. Requests for reconsideration are handled by QICs. Hearing requests are adjudicated by ALJs within OMHA. The Council, which often renders the final decision on behalf of the Secretary, is a part of the Secretary's office within HHS.

48.    A redetermination consists of an independent review of an initial claim determination. During the redetermination process, the MAC reviews the evidence and findings upon which the initial determination was based along with any additional evidence submitted by the provider. The MAC then issues a decision affirming or reversing (in whole or in part), the initial determination in question. 42 C.F.R. §§ 405.948, 405.954. A provider that is dissatisfied with a redetermination decision may seek review of that decision by the QIC.

49.    A reconsideration consists of an independent, on-the-record review of an initial determination and redetermination. The QIC will review the evidence and findings upon which the initial determination and redetermination were based along with any additional evidence submitted by the appellant. The QIC's decision must contain, among other things, an explanation of how pertinent laws, rules, and regulations apply to the case as well as the medical and/or

scientific rationale for the decision. 42 C.F.R. §§ 405.968(a)(1), 405.976(b). An appellant that is dissatisfied with a reconsideration decision may seek review of that decision by an ALJ.

50.     The ALJ hearing is the appellant's only opportunity to present its case in real time to an adjudicator. ALJ hearings are usually conducted via telephone. The appellant may present written statements about the facts and law relevant to the case, offer witness testimony, and make arguments regarding the issues in the case. 42 C.F.R. §§ 405.1020(b)(2), 405.1032(a), 405.1036(a)-(e).

51.     ALJs review cases *de novo*. ALJs are not bound by CMS subregulatory guidance documents or LCDs but may give substantial deference to those policies in cases where they are applicable. 42 C.F.R. §§ 405.1000(d), 405.1062(a).

52.     The administrative record before the ALJ consists of all evidence used in the initial determination, redetermination, and reconsideration processes as well as the evidence offered at the hearing or otherwise admitted into the record by the ALJ. Hearing decisions must contain, among other things, independent findings of fact and conclusions of law. 42 C.F.R. §§ 405.1042, 405.1046(a)(1). An appellant that is dissatisfied with an ALJ's decision may seek review of that decision by the Council.

53.     The Council is responsible for conducting *de novo* reviews of ALJ decisions. The Council is generally required to issue a decision within 90 days of receiving a request for review. 42 U.S.C. § 1395ff(d)(2). In the event the Council is unable to adjudicate an appeal within 90 days of receipt, the appellant may file a request to "escalate" its appeal to federal court. Within five days of receiving an appellant's escalation request, the Council must either render a decision or confirm it is unable to issue a decision and permit the appellant to seek review in federal court. 42 U.S.C. § 1395ff(d)(3)(B); 42 C.F.R. § 405.1132.

54. In a case where a provider escalates an appeal pending before the Council to federal court, the ALJ's decision becomes the Secretary's final decision for purposes of judicial review. *See, e.g., Ashli Healthcare, Inc. v. Becerra*, 2024 WL 389104, at *1 (E.D. Cal. August 21, 2024).

55. The Medicare statute places certain limitations on CMS' ability to recoup providers' Medicare reimbursement in overpayment cases. *See* 42 U.S.C. § 1395ddd(f).

56. If a provider contests an overpayment determination by filing a request for redetermination and, if needed, a request for reconsideration within certain timeframes, then CMS is prohibited from recouping the provider's Medicare payments to offset the alleged overpayment during the pendency of those appeals. *Id.* § 1395ddd(f)(2)(A); *see also* 42 C.F.R. § 405.379(b)-(d).

57. If the QIC renders a decision that affirms, in whole or in part, an overpayment finding, then CMS may begin recouping the provider's Medicare payments within 30 days of the reconsideration decision—regardless of whether the provider continues to appeal the overpayment determination. 42 C.F.R. § 405.379(f).

58. To prevent full recoupment of its Medicare reimbursement, a provider may request an ERS to repay an alleged overpayment in monthly installments. 42 U.S.C. § 1395ddd(f)(1)-(2); 42 C.F.R. § 401.607(c)(2).

59. CMS will review financial documentation submitted by the provider to determine whether to approve an ERS and, if approved, the duration of the amortization schedule. CMS regulations limit the amortization period of any approved ERS to 60 months. To determine the number, amount, and frequency of installment payments, CMS must consider: (a) the total amount of the overpayment; (b) the provider's ability to pay; and (c) the cost to CMS of

administering the ERS. 42 C.F.R. § 401.607(c)(1)-(3).

60.     As long as a provider makes timely installment payments as required under an approved ERS, CMS will not recoup the provider's Medicare payments to offset the alleged overpayment.

61.     The Medicare statute requires CMS to assess simple interest on overpayments until they are collected in full. 42 U.S.C. § 1395ddd(f)(2)(B). Interest begins accruing on overpayments 30 days after the date of the overpayment determination and continues to accrue until the overpayment balance is liquidated, regardless of whether the provider appeals the overpayment findings. 42 C.F.R. § 405.378(e).

## FACTUAL AND PROCEDURAL BACKGROUND

62.     At all times relevant hereto, Best Care was a Medicare-certified provider of hospice services.[6] Best Care maintains an average daily patient "census" of 178 patients, approximately 82% of which are Medicare beneficiaries. Best Care employs or contracts with 116 dedicated clinical and administrative professionals, including physicians, registered nurses, social workers, therapists, and counselors.

63.     Best Care provides high quality hospice services to the residents of the greater Dallas, Texas area. In 2023, for example, Best Care received the "Hospice CAHPS Award of Distinction," which recognizes hospices with superior caregiver satisfaction performance based on patient surveys conducted during the previous calendar year.[7]

64.     Best Care is accredited by the Accreditation Commission for Health Care (ACHC), an international body that assesses provider compliance with standards of patient care.

65.     According to CMS' "Hospice Compare" tool, Best Care exceeds the state and

---

[6] Best Care is sometimes referred to by its trade name, One Point Hospice, in the administrative record.
[7] The acronym "CAHPS" stands for "Consumer Assessment of Healthcare Providers and Systems."

national averages with respect to numerous family satisfaction and clinical quality metrics. For example, Best Care exceeded the national average for hospices in areas such as family communication, timely assistance for caregivers, provision of emotional and spiritual support, and completion of family training activities. According to CMS, Best Care's "Hospice Care Index" score is 9 out of 10, which exceeds the national average of 8.4 out of 10.

66.     At all times relevant hereto, Qlarant Integrity Solutions, LLC ("Qlarant") was the UPIC whose "jurisdiction" included the State of Texas.

67.     In a letter dated November 18, 2022, Qlarant provided notice of its intent to conduct a post-payment audit of certain hospice services billed by Best Care to the Medicare program between December 2019 and August 2022. The audit covered 47 claims for services rendered to various Medicare beneficiaries. Best Care submitted copies of its medical records to the UPIC as requested.

68.     In subsequent correspondence dated February 16, 2023, Qlarant alleged that 24 out of the 47 (or 51%) claims under review failed to meet Medicare coverage criteria and should not have been reimbursed. The UPIC further asserted that the claims it reviewed constituted a statistically valid sample of Best Care's claims for the audit period in question and thereby extrapolated an alleged Medicare overpayment in the amount of $8,521,461.62.

69.     Shortly after the contractor issued its overpayment determination, the MAC applied $1,942,270.87, which represented Medicare payments to Best Care for hospice services provided while the UPIC conducted its post-payment audit, to reduce the principal overpayment balance to $6,702,562.81.

70.     Upon receipt of the overpayment letter, Best Care promptly filed a request for redetermination with Palmetto. In an unfavorable notice of redetermination dated May 22, 2023,

the MAC upheld all aspects of the UPIC's extrapolated overpayment assessment, including the adverse claim determinations and the validity of Qlarant's sampling methodology.

71.    Best Care then sought reconsideration with the QIC, C2C Innovative Solutions, Inc. ("C2C"). On or around September 26, 2023, the QIC rendered a partially favorable reconsideration decision that reversed four unfavorable claim determinations. C2C otherwise agreed with the remaining adverse claim decisions and upheld Qlarant's use of statistical sampling to calculate the alleged overpayment.

72.    Based on the partially favorable reconsideration decision, the MAC recomputed the extrapolated overpayment amount to $6,382,192.62.

73.    On or about October 10, 2023, Best Care submitted a request for an ERS along with supporting financial records to the responsible CMS contractor.

74.    On November 22, 2023, Best Care requested a hearing before an ALJ to challenge the unfavorable aspects of the QIC's reconsidered determination.

75.    In December 2023, the MAC notified Best Care that its request for an ERS had been approved. The ERS required Best Care to make monthly installment payments of over $100,000 per month for 60 months. As a cursory review of Best Care's financial documentation would have shown, those payment amounts were wildly in excess of what Best Care could afford in the near-term.

76.    Meanwhile, the ALJ to whom the case was assigned held an evidentiary hearing on January 16, 2024. Best Care was represented by counsel and presented witness testimony from five witnesses (three of whom were clinical witnesses) concerning the remaining unfavorable claim determinations and issues related to the statistical sampling and extrapolation.

77.     Best Care's medical witness, Dr. Peralta, is a widely recognized expert in the area of hospice and palliative medicine with over 35 years of experience in the field. Dr. Peralta is a diplomat of the American Board of Hospice and Palliative Medicine and a certified hospice medical director. Dr. Peralta testified at length regarding each of the claims at issue in the case and expressed his professional opinion that each beneficiary qualified for hospice services during the dates of service in question.

78.     In a decision dated March 14, 2024, the ALJ found that Medicare covered five of the claims under appeal but denied coverage for the remaining 15 claims. The ALJ also determined that the UPIC's statistical sampling methodology was valid.[8]

79.     The ALJ affirmed the denial of 15 claims under review for various reasons, including but not limited to alleged non-compliance with the respective LCD criteria, purported stability in the beneficiaries' conditions during the dates of service in question, and technical issues associated with various documents. The ALJ generally found that the beneficiaries were ineligible for hospice services due to the alleged lack of uncontrolled symptoms, frequent changes to the plan of care, and specific conditions such as delirium, pneumonia, pressure ulcers, and recurrent or intractable infections.

80.     The ALJ found that Best Care had not complied with the respective LCD criteria in virtually every unfavorable determination. For example, in the case of beneficiary J.H., the ALJ incorrectly concluded that Medicare did not cover the hospice services in large part because "According to the LCD, documentation supporting hospice ***must*** show the combined effects of the primary [terminal] condition and any identified comorbid or secondary conditions are such

---

[8] The ALJ dismissed four of the claims associated with Best Care's hearing request because those claims were decided favorably by the QIC. Those dismissals were technically unnecessary, however, because the favorable aspects of C2C's determination were not properly before the ALJ. *See* 42 C.F.R. § 405.1032(a).

that, more likely than not, the beneficiary with the identified impairments would have a prognosis of 6 months or less." (emphasis added).

81. As another example, the ALJ improperly agreed with the denial of hospice services provided to beneficiary W.C. because the "…documentation of structural/functional impairments, together with the observed activity limitations of the beneficiary, do not demonstrate that hospice services were reasonable and necessary."

82. Similarly, in the case of beneficiary D.I., the ALJ sustained the denial of coverage for the dates of service under review because "the record does not show enough objective data on the disease progression, and how the impairments impacted the beneficiary's clinical status or vice versa, supporting the *required* criteria under the LCD." (emphasis added).

83. The ALJ did not acknowledge anywhere in his decision that the relevant LCD criteria are not "required" or mandatory for establishing Medicare coverage of hospice services.

84. The ALJ also inappropriately determined in virtually every unfavorable case that the beneficiaries did not qualify for hospice services because their conditions were "stable." For instance, the ALJ acknowledged in beneficiary A.D.'s case the clinical factors discussed by Best Care's medical witness during the hearing but nonetheless stated that "these indicators alone without documentation that they were becoming more pronounced or that there were other clinical variables not responding to treatment or causing decline, do not demonstrate a downward progression of [A.D.'s] clinical status."

85. For beneficiary J.R., the ALJ issued an unfavorable decision largely because the records "…do not show any changes in clinical variables supporting the likelihood of rapid decline or poor survival." The ALJ went on to observe that, "Overall, the beneficiary's clinical status was stable, and all her symptoms and conditions were controlled with medications."

86.     The ALJ did not acknowledge anywhere in his decision that CMS does not even require measurable decline in a patient's condition at the time of certification to substantiate coverage of hospice services, much less at the time of every claim period. *See* Medicare Program; Hospice Wage Index for Fiscal Year 2010, 74 Fed. Reg. 39384, 39399 (Aug. 6, 2009) ("We also acknowledge that at recertification, not all patients may show measurable decline.").

87.     The ALJ also found that beneficiaries W.C., J.D., J.H., A.S. (as to dates of service June 1, 2021 to June 30, 2021), and K.K. were not eligible for hospice care in large part because they did not suffer from conditions such as delirium, pneumonia, intractable or recurrent infections, pressure ulcers, or significant weight loss in the 180 days preceding the dates of service in question.

88.     In one case, the ALJ inappropriately disregarded the relevance of J.H.'s comorbid conditions because "they are not the kind of comorbid conditions given as examples in the LCD."

89.     Although the LCDs identify delirium, pneumonia, and pressure ulcers as examples of comorbid or secondary conditions that may be relevant to establishing a beneficiary's terminal status, nowhere in any of the policies does the MAC suggest that those examples were intended to be exhaustive in nature.[9]

90.     The ALJ did not acknowledge in his decision that the examples of comorbid and secondary conditions from the LCDs are non-exhaustive in nature. Similarly, the ALJ did not explain why the alleged absence of delirium, pneumonia, intractable or recurrent infections, pressure ulcers, or significant weight loss in the past 180 days are necessary to establishing

---

[9] Recurrent or intractable infections and weight loss within the previous 180 days are not mentioned in the LCDs applicable to this case. Instead, those criteria are found in different LCDs promulgated by MACs whose "jurisdictions" do not include Texas. *See* L33393 (LCD of National Government Services, Inc.), L34538 (LCD of CGS Administrators, LLC).

Medicare coverage of hospice services or even more relevant than the clinical facts discussed by Best Care's witnesses during the hearing.

91. In many cases, the ALJ only briefly acknowledged or otherwise failed to even mention Dr. Peralta's comprehensive, uncontradicted testimony. For example, the ALJ did not even reference Dr. Peralta's testimony and expert opinion as to the cases for beneficiaries A.S. (regarding dates of service June 1, 2021 to June 30, 2021) or J.S.

92. The ALJ also mischaracterized or otherwise failed to account for relevant clinical evidence in the record. In the case of J.R., for instance, the ALJ found that Medicare coverage did not exist in large part because of "a few of inconsistent documentation [sic] in the record." For reasons that are unclear, the ALJ deemed it "inconsistent" that the beneficiary reported during a June 20, 2022 face-to-face encounter that she had recently suffered an aspiration episode but could not remember the precise date. The ALJ then dismissed the significance of the beneficiary's reported weight loss, finding it somehow inconsistent that J.R. had lost 6 pounds "in the last few months" leading up to the June 20, 2022 face-to-face encounter and then subsequently lost 4 more pounds by the time of the next face-to-face visit in July 2022. None of these facts is inconsistent either taken together or when compared to the other clinical information in the record.

93. Similarly, the ALJ grossly misconstrued the evidence in the case of beneficiary D.I., finding that there was insufficient "objective" information in the record to support a terminal prognosis. For example, the ALJ found that there was no objective assessment of the patient's contractures. A contracture is a permanent and painful tightening of a muscle, tendon, or ligament that results in rigidity, joint deformity, and loss of movement around the joint. There is no clinically objective method to measure a contracture.

94.     The ALJ went on to find that the record did not contain evidence of D.I.'s weight loss and that the beneficiary was not weighed during the period under review. Due to frailty or other factors, hospice patients are often unable to stand upright on a scale and thus unable to be weighed in the traditional manner. In such cases, anthropomorphic measurements, such as the patient's mid-arm circumference ("MAC"), are widely accepted alternative indices of weight loss and nutritional impairment. D.I.'s left MAC decreased from 22 centimeters on December 28, 2020 to 21 centimeters on January 20, 2021. While the ALJ acknowledged this evidence, he did not accord it any weight for reasons that are unclear.

95.     The ALJ also disregarded other evidence, such as reports that the beneficiary was scratching and injuring herself, because the hospice nurses' notes indicated D.I. was calm and pleasantly confused during the nurses' visits. However, hospice nursing visits are often ordered at a frequency of once or twice per week. In the vast majority of cases, nurses are not present with the patient around the clock. For this reason, nurses must often rely on reports of patient symptoms, status, and behaviors from caregivers or family members. Although the family or caregiver reports may not align with the hospice nurse's assessment in a given visit, there is nothing inherently contradictory regarding this information.

96.     The claim examples discussed in the preceding paragraphs are reasonably representative of the issues raised throughout and claim determinations from the ALJ's decision.

97.     Based on the ALJ's partially favorable decision, the UPIC recalculated the extrapolated overpayment amount to be $4,970,489.93.

98.     Meanwhile, in or around June 2024, the MAC revised the ERS terms based upon the reduced extrapolated overpayment balance. This new ERS contained a graduated repayment

arrangement whereby Best Care's monthly payments would increase each year. The table below summarizes the required payment amounts for the applicable time periods.

| Payment Term | Payment Amount |
| --- | --- |
| June 2024 to June 2025 | $27,000 |
| July 2025 to June 2026 | $54,000 |
| July 2026 to June 2027 | $80,000 |
| July 2027 to December 2028 | $109,000 |

99.    On May 17, 2024, Best Care filed an appeal with the Council seeking review of the ALJ's decision.

100.    On or about August 30, 2024, Best Care submitted a formal offer to CMS' Division of Medicare Debt Resolution to settle the remaining overpayment balance. *See* 42 C.F.R. § 401.613.

101.    On February 18, 2025, CMS notified Best Care's representatives via telephone that its offer to compromise the overpayment amount had been declined. During this call, CMS officials reportedly expressed their opinion that Best Care was financially insolvent and incapable of making payments under a settlement agreement. *But see* 42 C.F.R. § 401.613(c)(1) (provider's inability to pay is a basis for CMS to compromise a claim). CMS also informed Best Care that, if Best Care agreed to a third-party audit and financial review, that it may reconsider its position on compromise of the overpayment. Best Care subsequently notified CMS that it agreed to undergo the requested audit.

102.    From approximately May to August 2025, Best Care submitted various financial records and other documents to the external auditor as requested. In December 2025, CMS notified Best Care that it would not change its decision to reject the offer in compromise based on the findings of the third-party auditor.

103.    On March 18, 2026, Best Care submitted a request to the Council to escalate its pending appeal to federal court.

104.    On March 26, 2026, the Council issued an administrative order confirming that it was unable to timely adjudicate Best Care's request for review. The Council's order confirmed that Best Care was entitled to escalate its appeal to federal court.

105.    The ALJ's decision is the final agency decision in this matter pursuant to 42 U.S.C. § 1395ff(b)(1)(A). Best Care has thus exhausted its administrative remedies, and this case is eligible for judicial review.

106.    Best Care's monthly ERS payments are set to increase from $54,000 to $80,000 (or by 32.5%) on July 17, 2026. To date, Best Care has taken extraordinary financial steps to remain operational while remitting its monthly ERS payments. These steps have included significant reductions in virtually all discretionary spending, reduction of administrative staff and overhead expenses, deferral of owner compensation, renegotiation of vendor contracts, use of available financing and credit facilities, and enhancements to billing operations and collections.

107.    For example, Best Care has consolidated certain administrative and operational functions with other providers to pool resources and reduce overhead costs to the maximum extent possible. These functions include but are not limited to patient intake, receptionist and administrative personnel duties, human resources support, and IT services.

108.    Best Care's owners have not taken compensation or distributions from the company since the UPIC released its audit results.

109.    Best Care has renegotiated its vendor agreements involving durable medical equipment, pharmacy services, and medical supplies to reduce expenses while maintaining the highest standards of patient care.

110.    Best Care has utilized multiple lines of credit and cash advance loans to manage short-term cash flow obligations and maintain core operations related to patient care and regulatory compliance.

111.    In an effort to reduce historical accounts receivable and improve its billing and collections functions, Best Care entered into an agreement with a new billing company. This has resulted in the reduction of outstanding accounts receivable to nearly zero and the implementation of more efficient billing processes to ensure timely reimbursement from payors.

112.    Best Care has a very limited ability to effect further reductions in costs and expenses to continue servicing the alleged Medicare debt without substantially compromising or reducing the quality of patient care and regulatory compliance activities.

113.    In the event its monthly payments to CMS are increased to $80,000, Best Care will be forced to implement significant reductions in expenses associated with patient care and regulatory compliance. If Best Care reduces its capacity to provide high quality care to patients, then that will result in a reduction in its average daily patient census. A reduction in patient census will, in turn, result in decreased revenue. This process will inevitably result in Best Care ceasing operations and going out of business.

114.    Best Care cannot miss or underpay an installment payment due under the ERS, because otherwise CMS will recoup all of Best Care's Medicare reimbursement. This would be catastrophic for Best Care because approximately 82% of its average daily patient census consists of Medicare beneficiaries.

115.    Accordingly, Best Care's financial professionals have determined that payment of the increased monthly ERS installments of $80,000 would ultimately force the company out of business.

**COUNT I – APPLICATION FOR PRELIMINARY INJUNCTION**

116.   Plaintiff hereby incorporates by reference paragraphs 1 through 115 herein.

117.   Best Care seeks entry of a preliminary injunction prohibiting CMS from collection no more than $54,000 per month under the ERS for the duration of this litigation.

118.   Best Care is substantially likely to prevail on the merits of its underlying claims concerning the ALJ's decision because, as summarized above, the ALJ has misapplied the governing legal standards, including but not limited to the applicable LCDs, and failed to accord sufficient weight to the uncontradicted opinion of the treating hospice physicians and Dr. Peralta. These flaws, taken individually or together, are ample bases to reverse the ALJ's decision. *Cf. Hospice of East Tex. v. Sec'y. of the U.S. Dep't. of Health and Hum. Servs.*, 2025 WL 1062504 (E.D. Tex. Feb. 21, 2025) (hospice overpayment determination reversed because the ALJ ignored relevant evidence in the record and disregarded the clinical judgment of the hospice physicians); *Albert v. Burwell*, 118 F.Supp.3d 505 (E.D. N.Y. 2015) (Medicare coverage decision reversed because the Council applied permissive LCD language as though it was mandatory).

119.   Best Care will suffer irreparable harm in the absence of a preliminary injunction. Best Care's financial professionals have determined that a $26,000 per month increase in its monthly payments to CMS will likely force the company out of business. *Cf. MaxMed Healthcare, Inc. v. Burwell*, 2015 WL 1310567, at *3 (W.D. Tex. Mar. 23, 2015) ("In the Medicare withholding context, going out of business can be sufficient evidence of irreparable injury."); *see also Med-Cert Home Care, LLC v. Azar*, 365 F.Supp.3d 742, 755-57 (N.D. Tex. Feb. 4, 2019); *Adams EMS v. Azar*, 2018 WL 5264244, at *10-11 (S.D. Tex. Oct. 23, 2018).

120.   In the event Best Care is forced out of business, 116 direct and contracted

employees will lose their jobs and approximately 178 patients will lose access to high quality hospice services. The harm to the Secretary, by contrast, is minimal. The Secretary will continue to collect ERS payments throughout this litigation that will cover both the monthly interest accrual and reduce the underlying principal balance. Therefore, the balance of harms weighs in favor of Best Care.

121.    The Secretary has never accused Best Care of providing poor or inadequate services to Medicare beneficiaries. Instead, this dispute centers on whether Medicare coverage criteria for hospice services have been met in a relatively small number of hospice claims. The public interest weighs in favor of allowing Best Care to continue to operate and serve its patients throughout this litigation.

<u>**COUNT II – INCORRECT LEGAL STANDARDS**</u>

122.    Plaintiff hereby incorporates by reference paragraphs 1 through 115 herein.

123.    The ALJ has not correctly applied the relevant legal standards governing Medicare coverage of hospice care, including but not limited to statutory and regulatory authority, CMS guidance, and the applicable LCDs.

124.    The ALJ's decisions upholding the adverse claim decisions are flawed because, among other reasons, the ALJ applied recommended coverage guidelines set forth in the LCDs as though they were mandatory requirements for coverage.

125.    The ALJ's coverage determinations are also legally erroneous because they do not accord sufficient weight to the clinical judgment exercised by the certifying hospice physicians or the expert testimony of Dr. Peralta.

<u>**COUNT III – LACK OF SUBSTANTIAL EVIDENCE**</u>

126.    Plaintiff hereby incorporates by reference paragraphs 1 through 115 herein.

127. The ALJ's coverage decisions are unsupported by substantial evidence because the medical records establish that the beneficiaries were terminally ill in that their life expectancies were six months or less if their illnesses ran the normal course.

128. No reasonable mind would accept the evidence cited by the ALJ in his unfavorable coverage decisions as sufficient to support the conclusion that the corresponding hospice claims are not covered by Medicare.

129. In reaching his unfavorable coverage determinations, the ALJ failed to appropriately consider evidence that fairly detracted from his decisions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

130. Enter a preliminary injunction prohibiting the Secretary from collecting more than $54,000 per month under the ERS.

131. Reverse the ALJ's decisions that Medicare does not cover the remaining denied hospice claims.

132. Award to Best Care all costs, damages, and attorneys' fees allowed under applicable law.

133. Grant to Best Care any other legal or equitable relief that the Court may deem just and proper.

Respectfully Submitted,

Dated:  May 26, 2026

/s/ Gemma R. Galeoto
Gemma R. Galeoto
TX Bar No. 24061047
**CALHOUN BHELLA & SECHREST LLP**
325 N. Saint Paul Street, Suite 2900
Dallas, TX 75201
Tel: (214) 981-9200

Fax: (214) 981-9203
ggaleoto@cbsattorneys.com

Adam L. Bird (*pro hac vice* application forthcoming)
D.C. Bar No. 1005485
**CALHOUN BHELLA & SECHREST LLP**
2121 Wisconsin Avenue N.W., Suite 200
Washington, D.C. 20007
Tel: (202) 804-6031
Fax: (214) 981-9203
abird@cbsattorneys.com

**Attorneys for Plaintiff**